## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RCN TELECOM SERVICES, INC.,<br>RCN-BECOCOM, LLC,<br>STARPOWER COMMUNICATIONS, LLC,<br>RCN TELECOM SERVICES OF<br>WASHINGTON, D.C., INC.,<br>RCN TELECOM SERVICES OF<br>MASSACHUSETTS, INC.,<br>RCN TELECOM SERVICES OF<br>PHILADELPHIA, INC.,<br>105 Carnegie Center<br>Princeton, NJ 08540<br><br>RCN TELECOM SERVICES OF ILLINOIS,<br>LLC<br>350 N. Orleans St., Suite 600<br>Chicago, IL 60654<br><br>Plaintiffs,<br><br>v.<br><br>AT&T CORP.,<br>1 AT&T Way<br>Bedminster, New Jersey 07921<br><br>AT&T COMMUNICATIONS, INC.,<br>1 AT&T Way<br>Bedminster, New Jersey 07921,<br><br>AND DOES 1-20,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____<br><br><br><br>JURY TRIAL REQUESTED |

## Complaint

Plaintiffs RCN Telecom Services, Inc.; RCN-BecoCom, LLC; Starpower

Communications, LLC; RCN Telecom Services of Illinois, LLC; RCN Telecom Services of

Philadelphia, Inc.; RCN Telecom Services of Massachusetts, Inc.; and RCN Telecom Services of

Washington, D.C., Inc. (collectively "RCN" or "Plaintiffs"), for this complaint against

defendants AT&T Corp., AT&T Communications, Inc., and DOES 1-20 (collectively "AT&T"), allege as follows:

## NATURE OF THE ACTION

1.    This case involves AT&T's failure to pay legally required charges for its use of Plaintiffs' local network facilities to receive and complete long-distance calls. Whenever one of AT&T's long-distance customers makes a long-distance call to one of Plaintiffs' local telephone customers, AT&T uses the Plaintiffs' local facilities to complete, or "terminate," the AT&T long-distance call. Similarly, whenever one of AT&T's long-distance customers uses a local telephone line provided by Plaintiffs to place a long-distance call, AT&T uses the Plaintiffs' local facilities to "originate" the long-distance call. Pursuant to contracts and Plaintiffs' federal and state tariffs on file with the Federal Communications Commission ("FCC") and state regulatory authorities, AT&T is required to pay Plaintiffs for this "originating" and "terminating" "access" to Plaintiffs' local exchange facilities.

2.    Beginning in or around 2000 and continuing through the present, AT&T orchestrated and implemented at least two fraudulent schemes in an attempt to avoid Plaintiffs' "access charges" (along with access charges of numerous other carriers), as described herein.

3.    The FCC has twice rejected AT&T's supposed bases for failing to pay access charges to local carriers such as Plaintiffs, in orders released in April 2004 and February 2005.[1] Rather than award damages, however, the FCC instructed carriers damaged by AT&T's violation of access charge requirements to seek recovery in court.

---

[1]    *See Petition for a Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges,* WC Docket No. 02-361, Order, FCC 04-97 (Apr. 21, 2004) ("*FCC Access Charge Order*"), and *AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services,* WC Docket Nos. 03-313 and 05-68, Order and Notice of Proposed Rulemaking, FCC 05-41 (Feb. 23, 2005) ("*FCC AT&T Calling Card Access Charges Order*").

4.      Particularly in light of these FCC decisions, AT&T has no excuse for its failure to pay lawfully tariffed access charges. Accordingly, Plaintiffs seek to recover the access charges that AT&T has unlawfully failed to pay and to enjoin AT&T from continuing its unlawful conduct.

## JURISDICTION AND VENUE

5.      This is in significant part a collection action for payments arising under section 203 of the Communications Act of 1934, 47 U.S.C. § 203, and Plaintiffs' interstate access tariffs filed thereunder. This Court accordingly has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 47 U.S.C. § 207. In addition, since AT&T is a common carrier, Plaintiffs' claims also arise under section 206 of the Communications Act of 1934, 47 U.S.C. § 206. This Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b), as AT&T has agents and transacts business in this district.

## ALLEGATIONS COMMON TO ALL COUNTS

## PARTIES

7.      All Plaintiffs are wholly-owned, ultimately, by RCN Corporation, a Delaware corporation.

8.      The principal place of business of RCN Telecom Services of Illinois, LLC is 350 N. Orleans St., Suite 600, Chicago, IL 60654. The principal place of business of all other Plaintiffs is 105 Carnegie Center, Princeton, NJ 08540.

9.      RCN Telecom Services, Inc. is a Pennsylvania corporation that provides telecommunications services in metropolitan areas in Pennsylvania (except for metropolitan Philadelphia), California, and New York. RCN Telecom Services Inc. is the successor in interest

to all claims previously held by RCN Telecom Services of California, Inc.; RCN Telecom Services of New York, Inc.; RCN Telecom Services of Southeast New York, Inc.; and RCN Telecom Services of Pennsylvania, Inc.  As a result of a pro forma reorganization in 2000, RCN Telecom Services Inc. assumed the operations, licenses and legal rights of these entities, without any change in ultimate ownership.

10.    RCN Telecom Services of Philadelphia, Inc. is a Pennsylvania corporation that provides telecommunications services in metropolitan Philadelphia, Pennsylvania.

11.    RCN Telecom Services of Massachusetts, Inc. is a Massachusetts corporation that is licensed to provide telecommunications services in Massachusetts.   RCN Telecom Services of Massachusetts, Inc. is a subsidiary of RCN Telecom Services, Inc., and is the parent of RCN-BecoCom, LLC.

12.    RCN-BecoCom, LLC, is a Massachusetts limited liability company that provides telecommunications services in Massachusetts.

13.    RCN Telecom Services of Washington, D.C., Inc. is a District of Columbia corporation that is licensed to provide telecommunications services in the District of Columbia. RCN Telecom Services of Washington, D.C., Inc. is a subsidiary of RCN Telecom Services, Inc., and is the parent of Starpower Communications, LLC.

14.    Starpower Communications, LLC, is a Delaware limited liability company that provides telecommunications services in Washington, D.C. and the surrounding metropolitan area, including communities in suburban Maryland and Northern Virginia.

15.    RCN Telecom Services of Illinois, LLC, is an Illinois limited liability company that provides telecommunications services in the city of Chicago, Illinois, and surrounding areas. RCN Telecom Services of Illinois, LLC is the successor in interest to all claims previously held

by RCN Telecom Services of Illinois, Inc., as it assumed the operations, licenses and legal rights of this former entity without any change in ultimate ownership.

16.     AT&T Corp. is a New York corporation with its principal place of business at 1 AT&T Way, Bedminster, New Jersey, 07921.  AT&T Corp. provides, among other things, telecommunications services throughout the United States, including in the District of Columbia. AT&T Corp. can be served with process by serving its registered agent for service of process: CT Corporation System, 1015 15th Street, N.W., Suite 1000, Washington, D.C.  20005.

17.     AT&T Communications, Inc. is a wholly owned subsidiary of AT&T Corp. AT&T Communications, Inc., with its principal place of business at 1 AT&T Way, Bedminster, New Jersey 07921, can be served with process by serving its registered agent for service of process: CT Corporation System, 1015 15th Street, N.W., Suite 1000, Washington, D.C.  20005.

18.     The true names and roles of defendants DOES 1-20, inclusive, are unknown to Plaintiffs, which accordingly sues those defendants by fictitious names.  Plaintiffs believe and allege that each of the DOE defendants is legally responsible in some manner for the events alleged in this Complaint and the resulting injury and damages caused to Plaintiffs.  Plaintiffs will amend the Complaint to reflect the true names and roles of the DOE defendants when Plaintiffs obtain that information.

19.     AT&T Corp. and its affiliates listed above, which are collectively referred to as "AT&T" throughout this complaint, effectively operate as a single enterprise.  AT&T has complete control and influence over these subsidiaries.  This control and influence includes, among other things, all decisions regarding the services AT&T's subsidiaries provide, the facilities they use, the traffic sent over those facilities, the agreements into which they enter, and the way they market and sell their service.  AT&T coordinates and controls one overarching

position concerning all of these issues from its corporate headquarters. AT&T and all of its

subsidiaries also operate as a single integrated operation, under a nationwide brand. AT&T has

used each of these subsidiaries, individually and collectively, as a subterfuge to assist AT&T in

conducting and perpetuating fraud. In particular, AT&T has used these subsidiaries to conceal

AT&T's interexchange traffic so that AT&T could avoid paying Plaintiffs' lawfully tariffed

access charges. AT&T routed interexchange traffic over facilities that these subsidiaries had

previously obtained for the express purpose of terminating primarily local traffic with Plaintiffs

and other LECs. This enabled AT&T to disguise its interexchange traffic from Plaintiffs and

other LECs, and, consequently, to avoid being billed access charges for this traffic. For the

foregoing reasons, the subsidiaries listed above constitute alter egos of AT&T Corp.

## BACKGROUND

### The Access Charge Regime

20.    This action centers on AT&T's non-payment for switched access charges owed to

Plaintiffs in accordance with Plaintiffs' lawful tariffs and their contracts with AT&T. Access

charges are the fees that long-distance carriers such as AT&T must pay local exchange carriers

such as Plaintiffs to defray the costs associated with the use of local exchange facilities for

originating and terminating long-distance calls. These switched access charges are established

and mandated by federal and state regulations and tariffs as well as contracts, which are

described in detail below.

21.    Since the breakup of the Bell System in 1984, local exchange carriers ("LECs"),

such as Plaintiffs, and long-distance carriers, such as AT&T, have played largely distinct roles in

the telecommunications industry. LECs have primarily carried local calls – i.e., calls between

end users located within local calling areas or exchanges. Long-distance carriers have

traditionally carried calls between exchanges, on both an intrastate and interstate basis. This long-distance service is known as "interexchange" service.

22.     In order to provide interexchange service, long-distance carriers such as AT&T typically establish one or more points of presence (POPs) within a given area. POPs are facilities that provide a point of interconnection between local exchange networks and interexchange networks. When a customer makes an interexchange call, that customer's local exchange carrier transports the call over the local exchange carrier's network to the POP of the long-distance carrier that the customer has selected (say, AT&T). The long-distance carrier then transports the call from the POP in the area where the calling party is located (i.e., where the call originates) to the POP in the area where the called party is located (i.e., where the call terminates). The called party's local exchange carrier then receives the call from the long-distance carrier, either directly or through an intermediary, and delivers it to the called party.

23.     The transmission of an interexchange call from the calling party to a long-distance carrier's POP is known as "originating access." The transmission of an interexchange call from a long-distance carrier's POP to the called party is known as "terminating access."

24.     Federal and state tariffs (or, in the absence of a tariff, contracts between the carriers) dictate the appropriate originating and terminating access charges that apply to a given interexchange call, depending on whether the call is interstate or intrastate. If the call originates in one state and terminates in another, the access charges that apply are set forth in interstate tariffs filed with the FCC. If the call originates and terminates within the same state, the access charges that apply are set forth in intrastate tariffs filed with individual state regulatory commissions.

25.    For historical and regulatory reasons beyond the scope of this Complaint, most LECs' intrastate access charges are often higher (in many cases, considerably so) than interstate access charges.

26.    Local calls are subject to a different regulatory regime, called "reciprocal compensation." Under reciprocal compensation, the parties exchanging local traffic either agree on the rate at which the carriers bill each other for termination of each other's local traffic (typically much lower than access charges) or the parties assume a relative balance of traffic and agree to an arrangement termed "bill and keep" in which no payments are exchanged between the carriers; rather carriers recover the costs of terminating traffic from their own customers.

27.    Plaintiffs own the switches used to provide to serve their customers. Thus, Plaintiffs will bill and collect access charges from long-distance carriers such as AT&T directly.

28.    Long-distance traffic destined for Plaintiffs' customers is delivered by the long-distance carrier, or another carrier acting on its behalf, to the network of the Incumbent Local Exchange Carrier at a switch called an access tandem. This tandem switch then routes traffic bound for an RCN customer to RCN's switch, which then routes the calls to Plaintiffs' customers. RCN typically leases high capacity lines (called "trunks"), to connect its switch to the ILEC's tandem switch. RCN has specific trunk groups that are designated to carry long distance traffic to its switch for terminating to its customers.

29.    Long distance carriers typically provide RCN with information that permits RCN to determine the jurisdictional nature of the call. This information enables RCN to assess and bill the appropriate interstate and intrastate terminating access charges to the long-distance carrier.

<u>AT&T's Obligations to Pay Access Charges to RCN</u>

30.    During the entire relevant period, Plaintiffs have offered switched access charges pursuant to tariffs filed with the FCC (for interstate access services) and the respective state public utilities commissions in states where Plaintiffs operate as local exchange carriers (for switched intrastate access services). The provisions of these tariffs are binding on AT&T and govern the rates, terms and conditions that RCN may offer switched access services.

31.    In May 2000, RCN and AT&T entered into a contract ("Contract") that requires AT&T to pay each Plaintiff's respective access charges on a going forward basis. As part of the Contract, the parties agreed as to the rates that AT&T would pay RCN for switched access services after May 8, 2000.

<u>AT&T's Evasion of Interstate and Intrastate Access Charges</u>

32.    Beginning in or around 2000, AT&T began disguising long-distance interexchange calls it delivered to Plaintiffs and other LECs, thereby preventing Plaintiffs from detecting the interexchange nature of the calls and enabling AT&T to avoid being billed for the lawfully tariffed access charges that apply to such calls. For example, AT&T repeatedly disguised interstate and intrastate long-distance calls as local calls, and in other cases disguised intrastate long-distance calls as interstate. AT&T disguised calls by concealing, changing, causing to be concealed or changed, or otherwise misrepresenting the originating telephone number transmitted with the call, and by materially misrepresenting other information provided to Plaintiffs. The information AT&T concealed, changed and/or misrepresented is information that is essential to the Plaintiffs' ability to identify whether calls are interexchange in nature and, if so, whether they are local, interstate long-distance or intrastate long-distance calls.

33.    By design, AT&T's improper call-termination scheme prevented Plaintiffs from distinguishing between local traffic and interexchange traffic. Plaintiffs were thus unable to bill for (or even to detect or measure) a great deal of interexchange voice traffic that AT&T delivered to Plaintiffs for termination. Therefore, Plaintiffs could not reasonably have been expected to determine AT&T's actual use of their access services and bill AT&T the appropriate charge.

34.    AT&T disguised, as described in paragraph 26 above, a substantial portion of its long-distance calls, apparently based upon the incorrect premise that the calls were not subject to access charges because they used Internet Protocol ("IP") for an intermediate portion of its transmission between AT&T POPs.

35.    IP is a technology that was originally developed for use in connection with the public Internet. Because IP is so efficient at carrying traffic, however, many carriers, including AT&T, have been implementing it on their private networks as well. And, although IP was originally developed to carry data traffic generated by computers, technological advances over the past several years have made it possible to use IP to transmit ordinary voice traffic as well.

36.    In this respect, IP technology is simply the latest in an array of transmission technologies used to transmit ordinary telephone calls from one point to another. Some carriers use microwave transmission, others use fiber-optic cables, others use satellites, and still others continue to use the copper wires that have been in use for decades. As the FCC has recognized, the mere choice of transmission technology makes no difference to the regulatory classification of a telephone call or the applicability of access charges. Instead, under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.,* "telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43).

Thus, under the Act and the FCC's long-standing rules, provided that the call begins and ends as an ordinary, circuit-switched telephone call, the technology a carrier elects to use to facilitate its transmission is irrelevant for purposes of access charges.

37.    In order for a long-distance carrier to use an Internet backbone in the transmission of ordinary long-distance voice traffic, it must perform what is known as a "protocol conversion" on *both* ends of the call.  For example, in the case of an AT&T long-distance subscriber in New York making a call to Washington, DC, the call (1) originates on the network of a local exchange carrier in New York as an ordinary telephone call, (2) is handed off to AT&T in that format, (3) is converted by AT&T into the IP format, (4) is transmitted by AT&T in the IP format on its Internet backbone for some distance between New York and Washington (although not necessarily the entire distance), (5) is converted back into an ordinary telephone call by AT&T or a party acting on its behalf, (6) is handed to the local exchange carrier in Washington in that format, and (7) is delivered to the called party in Washington by the local carrier.

38.    In this scenario, neither the calling party in New York nor the called party in Washington has any idea that their call has been converted to the IP format in the middle.  The transmission of the call, between or among points specified by the user, is dialed and received in the same manner as any other long-distance call, and AT&T's service offers nothing more than the transmission of information of the user's choosing, without a net change in the form or content of the information as sent and received   In fact, although AT&T has been performing these protocol conversions and using IP to transmit an increasing portion of its customers' long-distance telephone calls, it has continued to bill its customers for these calls as ordinary long-distance calls, it has not informed them that these protocol conversions were taking place, and it

has *not* stopped paying LECs the *originating* access charges that apply to these calls. By paying LECs the originating access charges on these calls, AT&T acknowledged that they were switched access calls.

39.    AT&T did, however, avoid paying *terminating* access charges for calls that it transmits using IP, by disguising those calls as local calls on the terminating end. As noted above, a long-distance call that AT&T transmits using IP is no different than a long-distance call using any of the other transmission technologies noted above, and the terminating LEC performs the same functions over the same facilities to deliver that call to the called party. In fact, the terminating LEC ordinarily would not even be aware of whether an interexchange call it receives from AT&T is transmitted using IP within AT&T's network, provided it is converted back into an ordinary telephone call before it is delivered to the terminating LEC.

40.    In addition to its misclassification of calls using IP, AT&T, as described in paragraph 26 above, disguised certain intrastate (in-state) prepaid calling card long-distance calls as interstate calls (which are in most cases subject to lower access charges), when in fact the calling and called parties were located in the same state, purportedly based on the incorrect premise that the calls were not subject to intrastate access charges because AT&T routed the call through its 8YY (i.e., 800-number) platform in another state. In other cases, AT&T disguised interstate and intrastate prepaid calling card calls so at to avoid being billed for access charges altogether.

41.    AT&T later attempted to justify this ruse by claiming that when a customer using such a card places a call to someone in the same state, the call would be considered interstate because it consists of two calls, one between the caller and the AT&T platform delivering the

recorded advertisement and one between that platform and the called party, and that at least one of those "calls" is interstate.

42.    AT&T pursued both the IP and calling card access-avoidance schemes surreptitiously for several years.  Then, in the wake of several criminal prosecutions of companies that had unlawfully evaded lawfully tariffed access charges,[2] AT&T sought to cloak its behavior with the imprimatur of the FCC.  Specifically, in October 2002, AT&T filed a petition with the FCC requesting that the FCC declare that a telephone call converted to IP, carried on an Internet backbone, and then converted back to an ordinary telephone call for termination was exempt from access charges.[3]  Then, in May 2003, AT&T filed another petition with the FCC requesting that the FCC declare that AT&T's prepaid calling card services as described above be deemed jurisdictionally interstate and therefore exempt from intrastate access charges.

43.    AT&T did not, however, wait for the FCC to rule on its petitions.  Instead, even while its petitions were pending and unbeknownst to Plaintiffs, AT&T continued its practice of improperly terminating long-distance calls to Plaintiffs and other LECs in a manner designed to evade the Plaintiffs' and other LECs' detection of the interexchange, and interstate and intrastate, nature of the calls and to avoid access charges on massive amounts of traffic.

_____

[2]    In 2001, the Department of Justice prosecuted NTS Communications and two of its officers for defrauding Ameritech and AT&T's local service affiliate by operating long-distance companies which "concealed the true nature" of the long-distance traffic they delivered for termination, and by characterizing that traffic instead as local. *See* Indictment, *United States v. Lacy Ward, et al.,* Case No. IP01-CR-0079-01-04-B/F (S.D. Ind. filed Jul. 11, 2001).  The defendants pleaded guilty to conspiracy to commit wire fraud and were sentenced to prison and restitution for "perpetrating a scheme that defrauded Southwestern Bell Telephone of millions of dollars in [access] fees."  Press Release, *Long Distance Provider NTS Communications, Inc. and Two Executives are Charged with Defrauding Southwestern Bell Telephone of Millions in Long Distance Usage Fees, U.S.* Dep't of Justice, Feb. 28, 2002.

[3]    *See Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges, WC* Docket No. 02-361 (FCC filed Oct. 18, 2002).

44.    Ultimately, the FCC unanimously rejected both of AT&T's petitions.  First, on April 21, 2004, the FCC declared that, under its longstanding existing rules, the conversion of ordinary telephone traffic to IP and back again has no effect on the regulatory classification of the telephone call.  The FCC further held that AT&T is required to pay access charges for *all* interexchange voice traffic that originates and terminates over circuit-switched local exchange networks, including traffic that is converted to IP and transmitted over AT&T's Internet backbone at some point in the middle before being reconverted to be delivered to a local carrier.  The FCC accordingly authorized local telephone companies to pursue collection actions such as this one against AT&T for access charges that AT&T had failed to pay based on its unlawful scheme.

45.    Then, on February 23, 2005, the FCC held that AT&T's prepaid calling card calls between callers located in the same state are intrastate telecommunications services subject to intrastate access charges, under the same "end to end" analysis that the Commission had applied to other calling card and other telecommunications services for many years.  As in its April 21, 2004 order, the FCC again instructed local exchange carriers that claims for unpaid access charges be filed with an appropriate court or state commission rather than brought to the FCC.

46.    Until it filed the petitions with the FCC described in paragraph 36, above, AT&T fraudulently concealed its schemes to avoid access charges.  Even when it filed these petitions, AT&T fraudulently misrepresented the extent to which it was engaging in such schemes.

47.    Even after these FCC decisions, AT&T has continued to engage in practices to prevent Plaintiffs' detection of the interexchange, and interstate and intrastate, nature of calls and thereby attempt to avoid access charges, but apparently on a lesser scale.

48.    Particularly in light of these FCC's decisions, AT&T has no excuse for continuing its scheme and its failure to pay Plaintiffs access charges for long-distance calls in accordance with Plaintiffs' state and federal tariffs, and the Contract.

## COUNT I
### (BREACH OF FEDERAL TARIFFS)

49.    Plaintiffs incorporate by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint

50.    For the reasons set forth above and in the *FCC Access Charge Order and FCC AT&T Calling Card Access Charges Order,* pursuant to Plaintiffs' lawful Federal Tariffs, AT&T is liable to Plaintiffs for its failure to pay interstate access charges on interstate interexchange traffic that AT&T delivered to Plaintiffs for termination.

51.    RCN's rates and terms for interstate access charges for long distance calls are set forth in the following tariffs on file with the FCC: RCN Telecom Services of Illinois, LLC F.C.C. Tariff No. 1 (on and after August 1, 2003); RCN Telecom Services of Illinois, Inc. F.C.C. Tariff No. 2 (prior to August 1, 2003); Starpower Communications, LLC F.C.C. Tariff No. 1; and RCN Telecom Services, Inc. Tariff F.C.C. No. 1. The interstate tariff of RCN Telecom Services, Inc., FCC Tariff No.1, also covers the interstate tariffed switched access offerings for all Plaintiffs not otherwise referenced in this paragraph.

52.    Plaintiffs' federal tariffs provide, among other things, that AT&T must pay Plaintiffs' tariffed access charges for both originating access and terminating access.

53.    Plaintiffs fully performed their obligations under their federal tariffs, except for those they were prevented from performing, those that they were excused from performing, or those that were waived by AT&T's misconduct as alleged herein.

54.     AT&T failed to pay Plaintiffs for interstate switched access services in accordance with the federal tariffs.

55.     AT&T materially violated Plaintiffs' federal tariffs by failing to pay the tariffed rates for the services it used.

56.     Plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT II
(BREACH OF STATE TARIFFS)

57.     Plaintiffs incorporate by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

58.     For the reasons set forth above and in the *FCC Access Charge Order and FCC AT&T Calling Card Access Charges Order,* AT&T is liable to Plaintiffs for its failure to pay intrastate access charges on intrastate interexchange traffic that AT&T delivered to Plaintiffs for termination.

59.     RCN's rates and terms for intrastate access charges for long distance calls within California are set forth in its tariff RCN Telecom Services, Inc. Cal. P.U.C. No. 2.  Prior to November 22, 2000, this tariff was on file as RCN Telecom Services of California, Inc. P.U.C. No. 2.

60.     RCN's rates and terms for access charges for long distance calls within Massachusetts are set forth in its tariff RCN-BecoCom, Inc. Ma. D.P.U. No. 4.

61.     RCN's rates and terms for intrastate access charges for long distance calls within Illinois are set forth in its tariff RCN Telecom Services of Illinois, LLC I.C.C. Tariff No. 2. Prior to June 13, 2003, the rates and terms were set forth in tariff RCN Telecom Services of Illinois, Inc. I.C.C. Tariff No. 2.

62.    RCN's rates and terms for intrastate access charges for long distance calls within New York are set forth in its tariff RCN Telecom Services, Inc. P.S.C. No. 7 Telephone. Prior to October 23, 2003, the rates and terms were set forth in tariffs RCN Telecom Services of New York, Inc. P.S.C. No. 7 Telephone and RCN Telecom Services of Southeast New York, Inc. P.S.C. No. 7 Telephone.

63.    RCN's rates and terms for intrastate access charges for long distance calls within Pennsylvania are set forth in its tariffs RCN Telecom Services, Inc. Pa. PUC No. 4 and RCN Telecom Services of Philadelphia Inc. PA PUC No. 4. Prior to January 12, 2001, the rates and charges that are now set forth in RCN Telecom Services, Inc. PA PUC No. 4 were on file as RCN Telecom Services of Pennsylvania, Inc. PA PUC No. 4.

64.    RCN's rates and terms for intrastate access charges for long distance calls within Maryland are set forth in its tariff Starpower Communications, LLC P.S.C. Md. No. 2 – Telephone

65.    RCN's rates and terms for intrastate access charges for long distance calls within Virginia are set forth in its tariff Starpower Communications, LLC S.C.C. Va. No. 3.

66.    Each of the tariffs referenced above provides, among other things, that AT&T must pay Plaintiffs' intrastate access charges for both originating access and terminating access.

67.    Plaintiffs fully performed their obligations under each of the tariffs referenced above, except for those they were prevented from performing, those that they were excused from performing, or those that were waived by AT&T's misconduct as alleged herein.

68.    AT&T materially violated the tariffs referenced above by failing to pay the tariffed rates for the services it used.

69.    Plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT III (In the Alternative)
### (BREACH OF CONTRACTS)

70.    Plaintiffs incorporate by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

71.    AT&T is obligated to pay Plaintiffs for interstate and intrastate switched access services in accordance with the Contract.

72.    Plaintiffs fully performed their obligations under the Contract, except for those they were prevented from performing, those they were excused from performing, or those that were waived by AT&T's misconduct as alleged herein.

73.    AT&T failed to pay RCN for interstate and intrastate switched access services in accordance with the Contract.

74.    AT&T materially breached the Contract by failing to pay for the switched access services it used.

75.    This Count is pleaded in the alternative, to the extent that Plaintiffs' Tariffs are determined not to apply.  In no way is this Count to be construed as an admission that the tariffs do not govern AT&T's obligations in this case.

76.    Plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT IV (In the Alternative)
### (UNJUST ENRICHMENT)

77.    Plaintiffs incorporate by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

78.     For the reasons set forth above and in the *FCC Access Charge Order and FCC AT&T Calling Card Access Charges Order,* pursuant to the Contract and/or Plaintiffs' federal and state tariffs, AT&T is liable to Plaintiffs for its failure to pay interstate and intrastate access charges on interexchange traffic that AT&T delivered to Plaintiffs for termination. This Count IV is pleaded solely in the alternative, in the unlikely event the contract and tariffs are determined not to apply to every instance of AT&T's alleged conduct... In no way is this Count IV to be construed as an admission that the Contract and tariffs do not govern this case.

79.     By terminating interexchange calls carried by AT&T to Plaintiffs' local telephone customers, Plaintiffs permitted AT&T's long-distance subscribers to complete long-distance calls to Plaintiffs' customers. Plaintiffs thereby conferred a benefit on AT&T.

80.     AT&T understood that the termination of interexchange calls by Plaintiffs was important to AT&T's long-distance customers, and it accordingly appreciated and recognized that Plaintiffs' termination of interexchange calls carried by AT&T was a benefit to AT&T.

81.     AT&T unjustly accepted and retained the benefit of Plaintiffs' call termination services without providing legally required compensation to Plaintiffs.

82.     Plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### COUNT V
(FRAUD)

83.     Plaintiffs incorporate by reference as though fully set forth herein the allegations of preceding paragraphs of this Complaint.

84.     AT&T committed fraud against Plaintiffs. Specifically, AT&T knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material facts, including, but not limited to the following:

(a)  AT&T made public statements that sought to falsely minimize the volume of interexchange traffic that it was delivering to Plaintiffs and other local exchange carriers for termination without payment of the appropriate access charges;

(b)  AT&T disguised long-distance calls placed by AT&T customers to Plaintiffs' local customers by concealing, changing, causing to be concealed or changed, or otherwise misrepresenting the originating telephone number transmitted with the call, and by misrepresenting other information provided to Plaintiffs, all of which was essential to Plaintiffs' ability to properly identify calls as interstate and intrastate interexchange calls;

(c)  AT&T provided Plaintiffs with false and incorrect information as to the relative percentages of interstate long-distance, intrastate long-distance, and local calls that AT&T delivered to other carriers to be delivered to Plaintiffs; and

(d)  AT&T failed to put Plaintiffs on notice with specificity of its practice of avoiding access charges for interexchange traffic, or of the extent to which AT&T adopted and employed this practice.

85.    These misrepresentations and omissions were false and misleading at the time they were made.

86.    AT&T made each of these misrepresentations and/or omissions with knowledge of their falsity or recklessly without regard for their truthfulness as a positive assertion, with the intent to deceive Plaintiffs, and with the intent to induce Plaintiffs to act in the manner herein alleged.

87.    Indeed, on a daily basis through the time period relevant to this Complaint, AT&T represented to its customers (but not to Plaintiffs), in bills and otherwise, that the interexchange calls that it delivered to Plaintiffs were in fact long-distance calls because it billed them long distance rates.

88.    Moreover, AT&T paid at least hundreds of millions of dollars in originating access charges on the same calls that it disguised as local calls so as to mislead Plaintiffs and other LECs into believing that no terminating access charges were due. Any claim by AT&T that it did not know that terminating access charges were due on these calls is contradicted by the fact that it paid the originating access charges on at least many of the same calls without disputing the bills it received for originating access charges. AT&T knew that these calls were long distance calls that were subject to access charges. It paid the originating access charges because in most cases it had no way to conceal the nature of these calls from the LECs providing originating access. But because it conceived of a scheme to deceive these same LECs, when they provided terminating access, into believing that these calls were local calls, it knowingly used this deceitful scheme in an effort to cheat Plaintiffs and other LECs out of hundreds of millions of dollars in terminating access charges.

89.    Plaintiffs were, in fact, deceived by AT&T's misrepresentations and omissions.

90.    Plaintiffs reasonably and justifiably relied to their detriment on AT&T's misrepresentations and omissions. Plaintiffs had no reason to believe that AT&T was engaging in trickery to avoid paying terminating access charges on such calls. Due to AT&T's fraudulent conduct, Plaintiffs were unable to bill for (or even to detect or measure) the interexchange traffic that AT&T terminated on Plaintiffs' local networks, and Plaintiffs were unable to ascertain the volume of interexchange traffic that AT&T was delivering for termination without payment of

access charges. The truth about the scope of AT&T's unlawful conduct accordingly remained within the peculiar knowledge of AT&T, which engaged in deceptive acts calculated to mislead and thereby obtain an unfair advantage.

91.    Plaintiffs were damaged as a direct and proximate result of AT&T's misrepresentations and omissions in an amount to be determined at trial. Such damages include, but are not limited to, the following:

(a)    The access charges that AT&T avoided paying;

(b)    The additional costs to Plaintiffs since discovery of AT&T's scheme of using complex and costly methods to determine and prove the amount of access charges that AT&T avoided through its fraudulent scheme; and

(c)    The opportunity cost of the delay in receiving funds during a time period when capital was extraordinarily difficult for CLECs such as Plaintiffs to raise.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grants relief for all misconduct as follows:

(a)    Money damages to be proven at trial, plus prejudgment interest;

(b)    Punitive damages;

(c)    Restitution;

(d)    All costs and attorney's fees incurred by Plaintiffs;

(e)    Preliminary and permanent injunctive relief enjoining defendants from continuing to engage in the fraud complained of;

(f)    A full accounting of the number of interexchange minutes improperly sent to be terminated by each Plaintiff as local traffic;

(g)   A full accounting of the number of interexchange minutes on calls where the caller and the ultimate called party were in the same state, sent by AT&T to be terminated by each Plaintiff on which AT&T did not pay an intrastate access charge;

(h)   Indemnification for claims that have been or may be asserted and damages that have been or may be sought by third parties arising in whole or in part from AT&T's wrongful conduct; and

(i)   Such further relief as this Court deems appropriate and just.

### JURY DEMAND

Plaintiffs hereby request a jury trial on all issues and claims.

July 20, 2005                                      Respectfully submitted,

Eric J. Branfman (D.C. Bar No. 164186)
Joshua M. Bobeck (D.C. Bar No. 443620)
Anitra D. Goodman (D.C. Bar No. 484434)
SWIDLER BERLIN LLP
3000 K Street, NW, Suite 300
Washington, DC 20007
202-424-7500


**ATTORNEYS FOR PLAINTIFFS**